## United States Bankruptcy Court, Northern District of Illinois

| Name of Assigned Judge | Manuel Barbosa | CASE NO. | 10-B-71561 |
|---|---|---|---|
| DATE | April 25, 2011 | ADVERSARY NO. | 10-A-96079 |
| CASE TITLE | Robert R. Galvan and Debra K. Galvan, Debtors<br><br>Donald Dickinson, Plaintiff<br><br>v.<br><br>Robert R. Galvan, Defendant. | | |

**DOCKET ENTRY TEXT**

For the reasons set forth below, judgment is entered in favor of the Defendant.

■ [ For further details see text below.]

## MEMORANDUM DECISION

This matter is before the Court on a 523(a)(2) claim, alleging that the Defendant obtained financing from the Plaintiff through false presences, misrepresentations or actual fraud, and therefore the amount still owed should be held non-dischargeable. The Court held an evidentiary hearing on March 29, 2011.

### Findings of Fact

The Defendant, Mr. Galvan, owned and operated a car dealership called Bob's Oswego Motors. In early 2002, the Plaintiff and the Defendant formed a corporation called Customer Credit Corporation as a joint venture to provide financing for customers purchasing vehicles at Bob's Oswego Motors. Mr. Dickinson

1 of 4

testified that his involvement in the venture was as the attorney who formed the corporation[1] and as an investor, and that Mr. Galvan ran the everyday operation of the corporation. There apparently was no written or formal operating agreement, nor was there written evidence as to investments in the corporation. Mr. Dickinson testified that he believed that equal shares were initially given between him and Mr. Galvan in the corporation, though he gave no explanation as to the effect of his alleged later investments. Mr. Dickinson testified that "their basic agreement was that I would be returned my investment plus interest." There was no testimony about any arrangement as to what that rate of interest would be or when any returns were to be made. Mr. Dickinson acknowledged that he "recognized there was some risk" in making the investment, though he "also recognized that there was not 100% risk." To initially fund the corporation Mr. Dickinson and Mr. Galvan co-borrowed $40,000 from Benchmark Bank in 2002. Mr. Dickinson acknowledged that in addition to financing installment contracts for purchasers from the dealership at least some portion of the investments in the company would also be used to purchase vehicles to be sold at the dealership. Mr. Dickinson testified that he personally invested an additional $110,000 in the company throughout its existence, though he admitted that none of the investments were memorialized by a written agreement, and gave little to no details about when or how he made the alleged investments.

Mr. Dickinson testified that at some time in 2005 or 2006 Mr. Galvan asked him to invest an additional $25,000 for the purpose of purchasing five or six cars. Mr. Galvan indicated that he thought he could make a profit selling the cars, and would return $500 per car out of the profits to Mr. Dickinson. Mr. Dickinson replied that he did not have the funds to invest, but suggested that they ask Benchmark Bank to extend an additional $25,000 on the loan they had from it, which the bank did. Mr. Dickinson asked Mr. Galvan three or four months later about the cars, and alleges that Mr. Galvan told him he had spent the money. Mr. Dickinson did not know how the funds were used.

Mr. Dickinson testified that in 2005 or 2006, he placed his 1999 or 2000 Toyota Camry with Mr. Galvan to sell, and alleged it was worth approximately $10,000. He believes that Mr. Galvan sold it but never gave him the proceeds of the sale. Mr. Dickinson gave no indication at the hearing as to what the terms or arrangement was with Mr. Galvan when he "placed" the vehicle for sale.

Mr. Galvan filed a petition for protection under Chapter 7 of the Bankruptcy Code with this Court on March 30, 2010. At that time, Mr. Dickinson still remained obligated on the loan to Benchmark Bank, though he acknowledged that Mr. Galvan had paid down about $20,000 of the total $65,000 loan. In addition, Mr. Dickinson received no return on his investment in the corporation, which is now defunct.

---

[1] Mr. Dickinson also testified that he had represented Mr. Galvan occasionally in several matters before they formed the joint venture, raising some question about the ethical propriety of an attorney entering into a business investment with a current or former client, see 1990 Rules Governing the Legal Profession and Judiciary in Illinois, Rule 1.8(a) "Unless the client has consented after disclosure, a lawyer shall not enter into a business transaction with the client if: (1) the lawyer knows or reasonably should know that the lawyer and the client have or may have conflicting interests therein; or (2) the client expects the lawyer to exercise the lawyer's professional judgment therein for the protection of the client."), but there was little detail presented on the circumstances surrounding the transaction or the prior representation at trial.

**Conclusions of Law**

In order for a creditor to receive an exception from discharge under 11 U.S.C. § 523(a)(2)(A) based on false misrepresentation, "a creditor must show that (1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." Ojeda v. Goldberg, 599 F.3d 712, 716-17 (7th Cir. 2010). In order to receive an exception from discharge under 11 U.S.C. § 523(a)(2)(A) based on actual fraud, "the creditor must establish the following: (1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the subject of the discharge dispute." In re Cooper, 2011 WL 722537 (Bankr. N.D. Ill. Feb. 23, 2011) (Squires, J.) (citing McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000)). Fraud "may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor that indicates he intended to deceive or cheat the creditor." Id. It may encompass "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." Id. (citing McClellan, 217 F.3d at 893). The creditor bears the burden of proving an exception to discharge, which he must prove by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654 (1991).

Here, the Plaintiff has presented so little evidence or detail about the circumstances surrounding the alleged misrepresentations and fraud that the Court cannot conclude by a preponderance of the evidence that Mr. Galvan made any fraudulent misrepresentation or committed any actual fraud. He has not demonstrated that the original $40,000 in financing through Benchmark Bank was obtained through fraud. It was the parties' understanding that that money would be used to purchase vehicles and to provide financing for customers of the dealership through installment contracts. But no evidence was presented that the money was not used for those purposes. By Mr. Dickinson's own testimony, the company entered into at least $119,000 in installment contracts in the first nine to twelve months of operation. The same is true for the $110,000 that he alleged he personally invested in the company. Not only was there no evidence that he actually invested that amount, or any detail as to when he made such investments, but there was no evidence presented that Mr. Galvan used the money invested for anything other than legitimate business purposes, such as financing installment purchase contracts. The fact that the money is now gone and Mr. Dickinson did not receive his investment back might simply show that Mr. Galvan was bad at business, not that fraud occurred. Mr. Dickinson's testimony showed that at least $119,000 of company money was used to fund installment purchase contracts. Mr. Dickinson admitted he did not keep track of the company's business or finances, and while he suggested Mr. Galvan might have used funds for personal obligations such as his mortgage, without any evidence of that, it is just as likely that the business lost money because purchasers did not pay on their installment contracts.

There were only two transactions where Mr. Dickinson came even close to giving details to suggest any bad behavior by Mr. Galvan. First, Mr. Dickinson alleges that Mr. Galvan persuaded him to help obtain an additional $25,000 in financing through the Benchmark Bank loan to purchase five or six vehicles. But, he gave no details about the purported misrepresentation. He did not, for example, state that Mr. Galvan described specific details about specific vehicles he planned to purchase or that he promised to purchase such specific vehicles. Thus, from the evidence presented, it might have been merely an indication of Mr. Galvan's intentions or plans at the time, and not a commitment or promise upon which Mr. Dickinson relied. Nor did Mr. Dickinson offer any proof that Mr. Galvan did not in fact use the funds to purchase vehicles. Instead, Mr.

Dickinson admitted that he did not know what Mr. Galvan did with the money. All Mr. Dickinson presented at trial was his "impression that [Mr. Galvan] spent it on his personal obligations or whatever." But a mere 'impression' without any foundation is not sufficient evidence to prove fraud by the preponderance of the evidence.

Mr. Dickinson also alleged that he "placed" his 1999 or 2000 Toyota Camry with Mr. Galvan to sell, that he thought Mr. Galvan sold it, and that he was never paid by Mr. Galvan. First of all, this transaction was not alleged in the Plaintiff's Adversary Complaint. Second, Mr. Dickinson presented no details about the transaction or their arrangement. Given the loose business arrangements between Mr. Dickinson and Mr. Galvan, it was just as plausible that Mr. Dickinson was contributing the vehicle to the company as an investment than entering into a consignment arrangement. The relationship was further complicated in that Mr. Dickinson admitted that he had originally received the Camry from Mr. Galvan. In any event, the Plaintiff presented no evidence that the Defendant obtained the vehicle from Mr. Dickinson fraudulently or upon a false representation. Even if they had entered into a consignment agreement, there was no evidence presented that at the time they entered into the agreement Mr. Galvan intended not to fulfill his end of the bargain. Additionally, even if Mr. Galvan sold the car, maybe the purchaser failed to pay Mr. Galvan. This is especially likely if the purchaser bought the Toyota through an installment contract.

### **Conclusion**

For the foregoing reasons, the Plaintiff failed to meet his burden of proof, and judgment will be entered in favor of the Defendant.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

April 25, 2011

Judge Manuel Barbosa